**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| JOSE H. MORAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SHARECARE, INC.,<br><br>Defendant. | Case No. ____________<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jose H. Moran ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Sharecare, Inc. ("Sharecare" or "Defendant"), and alleges as follows based upon personal knowledge as to his own acts and experiences, and, as to all other matters, upon information and belief, including the investigation of counsel:

## I. NATURE OF THE ACTION

1. This is a class action arising out of a data breach that compromised the personal information of Plaintiff and thousands of other individuals whose information Sharecare collected, maintained, or processed (the "Data Breach").

2. Sharecare is a digital-health and healthcare-technology company that provides software and technology-enabled services across the healthcare ecosystem, including services involving health plans, employers, providers, patients, and medical-record exchange and release of information.[1] Sharecare has publicly reported serving approximately 12.5 million eligible lives

[1] Sharecare, Inc., Annual Report (Form 10-K) (Mar. 16, 2023), at 3-7 (describing company's operations and services).

and approximately 8,000 hospitals and physician practices. To provide these services, Sharecare collects, receives, maintains, processes, and transmits substantial quantities of personal and health-related information.

3. On or about August 14, 2026, the threat actor group known as "ShinyHunters" publicly listed Sharecare, Inc. and the domain sharecare.com on its leak site, claiming to have compromised more than 3.4 million Salesforce records containing personal information and more than 28 gigabytes of internal corporate data.[2]

4. The threat actor stated that the data was "published" after failed ransom negotiations, stating that Sharecare "failed to reach an agreement with us despite our incredible patience."[3] The threat actor's posting included a file hash and compressed archive size, supporting the allegation that a discrete dataset was exfiltrated and published.

5. The Data Breach was a direct and foreseeable result of Sharecare's failure to implement and maintain reasonable data-security measures appropriate to the sensitivity of the information it collected and stored, and consistent with well-established standards applicable to entities handling personal and health-related information.

6. Upon information and belief, Plaintiff's personal information was among the information accessed, acquired, exfiltrated, or otherwise compromised in the Data Breach.

7. As a result of the Data Breach, Plaintiff and members of the proposed Class have suffered injury, including the compromise and exposure of their private information, an imminent and substantial risk of identity theft and fraud, the loss of the benefit of their bargain, the

---

[2]DeXpose, ShinyHunters Mounts Ransomware Attack on Sharecare, Inc., https://www.dexpose.io/shinyhunters-mounts-ransomware-attack-on-sharecare-inc/ (Aug. 14, 2026) (last visited Aug. 26, 2026).
[3]DeXpose, ShinyHunters Mounts Ransomware Attack on Sharecare, Inc., https://www.dexpose.io/shinyhunters-mounts-ransomware-attack-on-sharecare-inc/ (Aug. 14, 2026) (last visited Aug. 26, 2026) (reproducing verbatim threat actor statement).

diminution in value of their private information, and the lost time and expense of responding to the breach.

8. Plaintiff brings this action to recover damages and to obtain injunctive and equitable relief requiring Sharecare to adopt reasonable security practices adequate to protect the information that remains in its possession.

9. The information Sharecare collects and maintains is precisely the kind of information that criminals prize: durable identifiers and, in portions of its operations, health information that cannot be cancelled or reissued and that can be exploited for years after it is stolen. Sharecare knew, or should have known, that this information was a target and that its compromise would expose individuals to a serious and lasting risk of harm.

10. The measures that would have prevented or mitigated the Data Breach were well established, widely published, and readily available. Federal regulators and recognized standard-setting bodies have for years prescribed the specific safeguards that an entity holding this type of information is expected to implement. Sharecare's failure to implement one or more of those safeguards was not the product of an unforeseeable or sophisticated threat; it was the product of inadequate security in the face of a well-known risk.

11. Plaintiff seeks to represent a class of all individuals whose private information was compromised in the Data Breach. Plaintiff and the Class were injured by the same conduct—Sharecare's failure to secure the information entrusted to it—and they seek the same relief: compensation for the harm they have suffered and an order requiring Sharecare to protect the information that remains in its custody.

## II. PARTIES

12. Plaintiff Jose H. Moran is a natural person and, at all relevant times, a citizen and resident of Yonkers, Westchester County, New York.

13. Defendant Sharecare, Inc. is a Delaware corporation with its principal executive offices at 255 East Paces Ferry Road NE, Suite 700, Atlanta, Georgia 30305.

14. Sharecare is a digital-health and healthcare-technology company that provides software and technology-enabled services across the healthcare ecosystem, including through enterprise, provider, and life sciences channels. Sharecare's subsidiaries include Sharecare Health Data Services, Inc. and Sharecare Health Data Services, LLC, which provide automated release of information and medical-record services to hospitals and physician practices across the country.

## III. JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class consists of at least 100 members; and at least one member of the proposed Class is a citizen of a State different from Defendant. Plaintiff is a citizen of New York, and Sharecare is a citizen of Delaware and Georgia.

16. This Court has personal jurisdiction over Sharecare because Sharecare maintains its principal executive offices in this District, is at home in Georgia, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

17. Venue is proper in this District under 28 U.S.C. § 1391(b) because Sharecare resides in this District and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here. Sharecare's corporate decision-making, cybersecurity program management, and response to the incident are reasonably alleged to have occurred or emanated

from its Atlanta headquarters. Venue is proper in the Atlanta Division because Sharecare's principal executive offices are located in Fulton County.

## IV. FACTUAL ALLEGATIONS

### A. Sharecare collects and stores sensitive personal information.

18. Sharecare is a digital-health and healthcare-technology company that has provided software and technology-enabled services across the healthcare ecosystem for over a decade.[4] Sharecare operates through enterprise, provider, and life sciences channels, serving health plans, employers, providers, patients, and other participants in the healthcare industry.

19. Sharecare's services include release of information, medical-record retrieval, and other health-data functions provided through its subsidiaries, including Sharecare Health Data Services, Inc. and Sharecare Health Data Services, LLC. Sharecare Health Data Services provides automated release of information and medical-record archiving to thousands of clients, including medical practices, hospitals, and health systems across the country.

20. Upon information and belief, Sharecare was responsible for the cybersecurity policies, practices, systems, and controls applicable to the compromised Salesforce environment.

21. Upon information and belief, Sharecare maintained and operated enterprise information systems used across its businesses and subsidiaries, including the Salesforce environment compromised in the Data Breach, and personal information received or processed through Sharecare Health Data Services was maintained in, transmitted to, synchronized with, or otherwise accessible through Sharecare-controlled systems.

[4] Sharecare, Inc., Annual Report (Form 10-K) (Mar. 16, 2023), at 1 (identifying principal executive offices at 255 East Paces Ferry Road NE, Suite 700, Atlanta, Georgia 30305).

22. In the ordinary course of providing these services, Sharecare collects, receives, maintains, processes, and transmits substantial quantities of personal and health-related information from and about individuals.

23. Upon information and belief, the information Sharecare collects and maintains includes identifying information such as names, addresses, dates of birth, and contact information, together with, in portions of its operations, protected health information and other sensitive personal information. Sharecare's privacy policy states that it collects and maintains personal information including health-related information, and that it receives from Enterprise Organizations names, dates of birth, gender, mailing addresses, coverage details, plan identification numbers, and claims data "in [its] capacity as a business associate under HIPAA."

24. Individuals who provided information to Sharecare, or whose information was provided to Sharecare by healthcare providers, health plans, employers, or other entities, reasonably expected that Sharecare would safeguard their information and use it only for legitimate purposes, consistent with Sharecare's legal obligations and its own representations.

**B. Sharecare represented that it would protect personal information.**

25. Sharecare solicited, collected, and received sensitive personal information, and it did so against a backdrop of representations and obligations—express and implied—that it would keep that information confidential and secure.

26. Sharecare maintained a privacy policy in which it represented that "Sharecare values your trust, and protecting your information is our highest priority."[5] Sharecare further represented that it "is committed to using industry-leading security practices such as ISO27001 and HITRUST" and that it "compl[ies] with HIPAA's security rule, where applicable."

---

[5] Sharecare Privacy Policy, https://www.sharecare.com/privacy-policy (last visited Aug. 26, 2026) (stating "Sharecare values your trust, and protecting your information is our highest priority").

27. Sharecare represented that it "encrypt[s] many of [its] Services using SSL," that it "review[s] [its] information collection and storage and processing practices, including physical security measures, to guard against unauthorized access to systems," and that it "restrict[s] access to Personal Information to Sharecare employees, contractors and agents who need to know that information in order to process it."[6] Sharecare further represented that on an annual basis it undergoes "independent, third-party ISO27001, HITRUST, [HIPAA] and SSAE 16 audits" and third-party penetration testing.

28. Sharecare's Health Data Services subsidiary represented that its platform "complies with the latest security and privacy standards, including HIPAA and HITRUST, and provides auditable access control for all records, whether stored or in-transit," and that services are delivered "upholding the latest compliance, security and privacy standards." Plaintiff and the Class reasonably relied on these representations and obligations in entrusting their information to Sharecare or permitting their information to be processed by Sharecare.

**C. The Data Breach.**

29. On or about August 14, 2026, the threat actor group known as "ShinyHunters" publicly listed Sharecare, Inc. and the domain sharecare.com on its leak site, claiming to have compromised more than 3.4 million Salesforce records containing personal information and more than 28 gigabytes of internal corporate data.[7]

30. The threat actor stated that the data "was published" after Sharecare "failed to reach an agreement with us despite our incredible patience." The posting included a compressed archive

[6] Sharecare Privacy Policy, https://www.sharecare.com/privacy-policy (last visited Aug. 26, 2026) (stating "Sharecare values your trust, and protecting your information is our highest priority").

[7] DeXpose, ShinyHunters Mounts Ransomware Attack on Sharecare, Inc., https://www.dexpose.io/shinyhunters-mounts-ransomware-attack-on-sharecare-inc/ (Aug. 14, 2026) (last visited Aug. 26, 2026) (reproducing verbatim threat actor statement, file hash, and archive size).

size of more than 25 gigabytes and a SHA-256 hash, supporting the allegation that a discrete dataset was exfiltrated and published.[8]

31. Upon information and belief, the threat actor gained unauthorized access to Sharecare's Salesforce environment and acquired data containing the personal information of Plaintiff and members of the proposed Class.[9]

32. Because the exfiltrated information remains in the possession of criminal actors and is subject to sale or disclosure on illicit online marketplaces, the private information of Plaintiff and the Class remains at continuing risk of misuse.

**D. Sharecare's data-security obligations.**

33. As an entity entrusted with personal and, in portions of its operations, protected health information, Sharecare was subject to well-established legal and industry obligations to safeguard the information in its custody.

34. The Health Insurance Portability and Accountability Act ("HIPAA") and its implementing Security Rule establish a recognized standard of care for the protection of electronic protected health information. Sharecare's privacy policy acknowledges that it acts "in [its] capacity as a business associate under HIPAA" with respect to certain information it receives from Enterprise Organizations. As a HIPAA business associate in portions of its operations, the HIPAA Security Rule informs the applicable standard of care for electronic protected health information handled in that capacity. See 45 C.F.R. §§ 164.302–164.318. *HIPAA is pleaded here solely as a reference for the applicable standard of care and not as an independent cause of action or as a basis for negligence per se.*

---

[8] DeXpose, ShinyHunters Mounts Ransomware Attack on Sharecare, Inc., https://www.dexpose.io/shinyhunters-mounts-ransomware-attack-on-sharecare-inc/ (Aug. 14, 2026) (last visited Aug. 26, 2026).

[9] DeXpose, ShinyHunters Mounts Ransomware Attack on Sharecare, Inc., https://www.dexpose.io/shinyhunters-mounts-ransomware-attack-on-sharecare-inc/ (Aug. 14, 2026) (last visited Aug. 26, 2026).

35. The U.S. Department of Health and Human Services has long published guidance confirming that reasonable cybersecurity safeguards are a settled expectation for healthcare organizations, not a novel obligation.[10]

36. Federal guidance specific to the healthcare sector identifies foundational safeguards that providers are expected to implement, including email protection, endpoint protection, access management, data protection, vulnerability management, and incident-response planning.[11] The Department has further identified sector cybersecurity performance goals prioritizing multifactor authentication, encryption, credential management, and incident planning.[12]

37. Beyond the healthcare sector, the Federal Trade Commission has repeatedly instructed businesses that reasonable data security requires inventorying stored personal information, securely disposing of data that is no longer needed, encrypting sensitive information, understanding system vulnerabilities, and planning for breaches.[13] The FTC has likewise emphasized building security into operations from the outset, including access controls, strong authentication, network segmentation and monitoring, and timely patching.[14]

38. Widely recognized technical frameworks define the baseline of reasonable security. The National Institute of Standards and Technology publishes a comprehensive catalog of security and privacy controls addressing access control, authentication, audit and logging, incident

---

[10] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, Security Rule Guidance Material, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited July 7, 2026).

[11] U.S. Dep't of Health & Human Servs., 405(d) Program, Health Industry Cybersecurity Practices: Managing Threats and Protecting Patients (2023 ed.), https://405d.hhs.gov/Documents/HICP-Main-508.pdf (last visited July 7, 2026).

[12] U.S. Dep't of Health & Human Servs., Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals (2024), https://hhscyber.hhs.gov/documents/cybersecurity-performance-goals.pdf (last visited July 7, 2026).

[13] Fed. Trade Comm'n, Protecting Personal Information: A Guide for Business (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited July 7, 2026).

[14] Fed. Trade Comm'n, Start with Security: A Guide for Business (June 2015), https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited July 7, 2026).

response, and risk assessment.[15] The Center for Internet Security publishes a prioritized set of Critical Security Controls that represents industry consensus on reasonable security practices.[16]

39. Sharecare failed to implement one or more of these basic, well-established safeguards, and that failure permitted the threat actor to access and exfiltrate the private information of Plaintiff and the Class.

**E. Reasonable security required specific, well-defined safeguards that Sharecare failed to implement.**

40. The measures that constitute reasonable data security for an organization holding sensitive personal and health information are not vague aspirations; they are specific, cataloged, and freely published. The National Institute of Standards and Technology maintains a comprehensive control catalog addressing, among other families, access control, identification and authentication, audit and accountability, incident response, risk assessment, and system and information integrity.[17]

41. The Center for Internet Security publishes a prioritized set of Critical Security Controls—including inventory and control of assets, continuous vulnerability management, controlled use of administrative privileges, maintenance and monitoring of audit logs, malware defenses, boundary defense, and data protection—that represents industry consensus on the safeguards a reasonable organization must implement.[18]

---

[15] Joint Task Force, Nat'l Inst. of Standards & Tech., Security and Privacy Controls for Information Systems and Organizations, NIST Special Publication 800-53, Rev. 5 (Sept. 2020), https://doi.org/10.6028/NIST.SP.800-53r5 (last visited July 7, 2026).
[16] Ctr. for Internet Sec., CIS Critical Security Controls (v8.1) (2024/2025), https://www.cisecurity.org/controls/v8-1 (last visited July 7, 2026).
[17] Joint Task Force, Nat'l Inst. of Standards & Tech., Security and Privacy Controls for Information Systems and Organizations, NIST Special Publication 800-53, Rev. 5 (Sept. 2020), https://doi.org/10.6028/NIST.SP.800-53r5 (last visited July 7, 2026).
[18] Ctr. for Internet Sec., CIS Critical Security Controls (v8.1) (2024/2025), https://www.cisecurity.org/controls/v8-1 (last visited July 7, 2026).

42. For healthcare organizations specifically, the Department of Health and Human Services, through its 405(d) program, identified a set of practical safeguards keyed to the sector's most significant threats, including email protection, endpoint protection, access management, data protection and loss prevention, and vulnerability management.[19] The Department separately articulated sector cybersecurity performance goals emphasizing multifactor authentication, encryption, credential management, and incident planning as foundational.[20]

43. The Federal Trade Commission has distilled comparable expectations from decades of enforcement, instructing businesses to build security into their operations from the start, to control access to data, to require secure authentication, to segment and monitor networks, to apply sound security practices when developing and maintaining systems, and to keep security current through patching and monitoring.[21] These expectations reflect a settled regulatory understanding of reasonable security, not a novel or shifting standard.[22]

44. Upon information and belief, Sharecare failed to implement one or more reasonable safeguards sufficient to prevent or mitigate the intrusion and exfiltration that occurred, and that failure was a direct and proximate cause of the Data Breach.

**F. The HIPAA Security Rule informs the applicable standard of care.**

45. As an entity that acts as a HIPAA business associate in portions of its operations, Sharecare was subject to the HIPAA Security Rule with respect to electronic protected health information it handles in that capacity. The Security Rule establishes a nationally recognized

[19] U.S. Dep't of Health & Human Servs., 405(d) Program, Health Industry Cybersecurity Practices: Managing Threats and Protecting Patients (2023 ed.), https://405d.hhs.gov/Documents/HICP-Main-508.pdf (last visited July 7, 2026).

[20] U.S. Dep't of Health & Human Servs., Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals (2024), https://hhscyber.hhs.gov/documents/cybersecurity-performance-goals.pdf (last visited July 7, 2026).

[21] Fed. Trade Comm'n, Start with Security: A Guide for Business (June 2015), https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited July 7, 2026).

[22] Fed. Trade Comm'n, Data Security (resource page), https://www.ftc.gov/business-guidance/privacy-security/data-security (last visited July 7, 2026).

framework for safeguarding electronic protected health information. Plaintiff references the Security Rule solely as evidence of the applicable standard of care—not as an independent cause of action and not as a basis for negligence per se.

46. The Security Rule requires covered entities and, as applicable, business associates, to ensure the confidentiality, integrity, and availability of the electronic protected health information they create, receive, maintain, or transmit; to protect against reasonably anticipated threats or hazards to the security of that information; to protect against reasonably anticipated impermissible uses or disclosures; and to ensure workforce compliance. See 45 C.F.R. § 164.306(a).

47. The Security Rule further requires covered entities and, as applicable, business associates to implement administrative, physical, and technical safeguards, including access controls that limit information-system access to authorized persons and software, audit controls, integrity controls, and transmission security. See 45 C.F.R. §§ 164.308, 164.310, 164.312.

48. The Department of Health and Human Services has long published guidance elaborating on these obligations and confirming that basic safeguards and cyber-preparedness are longstanding expectations for entities holding protected health information.[23]

49. Sharecare's failure to prevent the unauthorized access to and exfiltration of personal information is evidence that Sharecare did not meet the standard of care that these frameworks reflect.

**G. The Data Breach was foreseeable and preventable.**

50. The risk that entities holding substantial quantities of personal and health-related information would be targeted by data-theft attacks was well known long before August 2026.

[23] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, Security Rule Guidance Material, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited July 7, 2026).

Federal authorities have repeatedly warned that data breaches and cyber-extortion are pervasive and evolving threats and have published detailed, freely available guidance on how to prevent and mitigate them.

51. The exploitation of known, unpatched vulnerabilities is a leading vector for such attacks, and timely vulnerability management is a baseline cybersecurity function that federal authorities have long urged organizations to perform.[24]

52. Data breaches affecting the healthcare sector have become routine and are among the most common categories of reported data compromises, a trend documented in annual reporting on breach volume.[25]

53. Federal healthcare regulators have specifically recognized that ransomware presents a foreseeable threat to protected health information and that a ransomware incident triggers a covered entity's breach-analysis obligations.[26]

54. Given the sensitivity and volume of the information Sharecare collected, and the well-publicized wave of data breaches and cyber-attacks against entities in the healthcare ecosystem, the Data Breach was a foreseeable consequence of Sharecare's failure to maintain reasonable security. Had Sharecare implemented the safeguards described above, the Data Breach could have been prevented or its impact materially limited.

### H. Data-exfiltration attacks on entities in the healthcare ecosystem were a known and escalating threat.

[24] Cybersecurity & Infrastructure Sec. Agency, Known Exploited Vulnerabilities Catalog, https://www.cisa.gov/known-exploited-vulnerabilities-catalog (continuously updated) (last visited July 7, 2026).

[25] Identity Theft Res. Ctr., 2025 Data Breach Report (Twentieth Edition) (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf (last visited July 7, 2026).

[26] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, Fact Sheet: Ransomware and HIPAA (Sept. 20, 2021), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity/ransomware-fact-sheet/index.html (last visited July 7, 2026).

55. For years preceding the Data Breach, federal cybersecurity authorities repeatedly and publicly warned that entities handling personal and health-related information were among the most heavily targeted victims of data-theft campaigns. The Cybersecurity and Infrastructure Security Agency, together with partner agencies, has published and repeatedly updated detailed guidance identifying ransomware and data-exfiltration attacks as pervasive threats and prescribing specific, freely available defensive controls.

56. These warnings were not abstract. Federal healthcare regulators specifically advised entities that handle protected health information that data breaches were foreseeable, that such incidents trigger notification obligations, and that entities must prepare contingency and response plans in advance.

57. The threat was compounded by the evolution of cyber-extortion into a "double-extortion" model, in which attackers not only encrypt a victim's systems but also exfiltrate sensitive data and threaten to publish it. This model was widely documented and well known before August 2026, and it made the theft and public exposure of personal data a foreseeable consequence of any successful intrusion.

58. The scale of healthcare-sector breaches underscored the risk. Annual reporting on data-compromise volume has repeatedly identified healthcare as one of the most-affected sectors, with the number of reported compromises and affected individuals reaching record levels in recent years.[27]

59. Numerous large, well-publicized ransomware and data-theft incidents affecting entities in the healthcare ecosystem preceded the Data Breach and placed the entire sector—

---

[27] Identity Theft Res. Ctr., 2025 Data Breach Report (Twentieth Edition) (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf (last visited July 7, 2026).

including Sharecare—on notice that entities handling protected health information were prime targets and that reasonable, current safeguards were essential.[28]

60. Sharecare, as an entity handling substantial quantities of personal and health-related information, knew or should have known of these warnings and of the acute risk to the sensitive information in its custody. Sharecare's SEC-filed annual report acknowledges that threats including "employee or contractor error, negligence, or malfeasance, have created, and can in the future create system disruptions, shutdowns, or unauthorized disclosure or modifications of confidential information." Sharecare further acknowledged that a breach of its systems "or any of [its] third-party information technology partners has, and in the future could, compromise [its] networks or data security processes."[29]

61. The ShinyHunters threat actor group's targeting of Salesforce environments was documented and publicly warned about before the August 2026 Data Breach. Google/Mandiant published detailed findings and hardening guidance concerning the ShinyHunters campaign in early 2026.[30] Sharecare had public warning about the specific attack pattern against the specific platform type it used.

62. Sharecare's Health Data Services subsidiary previously suffered a data breach in which an unauthorized third party accessed its servers and transferred personal information outside of Sharecare's network, including names, addresses, dates of birth, subscriber numbers that were

---

[28] Identity Theft Res. Ctr., 2025 Data Breach Report (Twentieth Edition) (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf (last visited July 7, 2026).

[29] Sharecare, Inc., Annual Report (Form 10-K), at 37-38 (Mar. 29, 2024), https://www.sec.gov/Archives/edgar/data/1816233/000181623324000099/sharecare-arsfor2023x42924.pdf (last visited Aug. 26, 2026).

[30] Mandiant & Google Threat Intelligence Group, *Vishing for Access: Tracking the Expansion of ShinyHunters-Branded SaaS Data Theft* (Jan. 30, 2026), https://cloud.google.com/blog/topics/threat-intelligence/expansion-shinyhunters-saas-data-theft (last visited Aug. 26, 2026).

Social Security numbers, medical record numbers, and provider information.[31] That filing disclosed that Sharecare engaged Mandiant, a leading forensic firm, to investigate that prior incident. That prior breach—which is separate from the August 2026 Data Breach at issue here—placed Sharecare on direct notice that its health-data services were targets for criminal attack and that the sensitive information it maintained required vigilant protection.

63. The methods by which threat actors gain access to victim networks are well documented and defensible against. Attackers routinely exploit known, publicly cataloged software vulnerabilities for which patches are available, compromise credentials through phishing, and move laterally through networks that lack segmentation and monitoring. Federal authorities maintain and continuously update a public catalog of known exploited vulnerabilities precisely so that organizations can prioritize remediation and close these avenues of attack.[32]

64. Because these attack methods are known and the corresponding defenses are established, a successful unauthorized intrusion and data exfiltration of the kind alleged here ordinarily reflects a failure to implement one or more baseline safeguards—such as timely patching, multifactor authentication, network segmentation, and continuous monitoring—rather than an unforeseeable or irresistible threat.[33]

65. Federal incident-response guidance further recognizes that organizations must prepare for security incidents in advance and integrate incident response into their overall risk-

---

[31] California Physicians' Service d/b/a Blue Shield of California, *Notice of Data Breach* (Feb. 2019), https://oag.ca.gov/system/files/BS%20SSN%20Notice_0.pdf (filed with the California Office of the Attorney General) (last visited Aug. 26, 2026).

[32] Cybersecurity & Infrastructure Sec. Agency, Known Exploited Vulnerabilities Catalog, https://www.cisa.gov/known-exploited-vulnerabilities-catalog (continuously updated) (last visited July 7, 2026).

[33] Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., #StopRansomware Guide (initial release Sept. 2020; updated Mar. 2025), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf (last visited July 7, 2026).

management program, so that when an incident occurs the organization can rapidly detect, contain, and remediate it and limit the harm to affected individuals.[34]

66. Sharecare's failure to prevent, detect, and contain the Data Breach, and the resulting exfiltration of the private information of Plaintiff and the Class, reflects a departure from these well-established expectations.

**I. Sharecare's response obligations.**

67. Upon discovering a cyberattack, an entity handling personal and health-related information is expected to promptly identify and respond to the incident, mitigate harm, and provide affected individuals with timely and accurate notice of the nature and scope of the compromise. Established incident-response guidance requires organizations to integrate incident handling into their broader risk-management program to reduce impact and speed detection, response, and recovery.

68. The FTC's data-breach-response guidance similarly directs organizations to secure their systems, remediate vulnerabilities, preserve evidence, and provide required notifications without delay.[35]

**J. The value of the compromised information and the resulting risk of harm.**

69. The private information compromised in the Data Breach is valuable to criminals because identifying information can be aggregated with other available information and used to facilitate identity theft, fraud, phishing, social engineering, and other forms of misuse.

70. Federal consumer-protection authorities and the Government Accountability Office have long recognized that personal information of the type maintained in enterprise customer-

[34] Nat'l Inst. of Standards & Tech., Incident Response Recommendations and Considerations for Cybersecurity Risk Management: A CSF 2.0 Community Profile, NIST Special Publication 800-61, Rev. 3 (Apr. 2025), https://csrc.nist.gov/pubs/sp/800/61/r3/final (last visited July 7, 2026).

[35] Fed. Trade Comm'n, Data Breach Response: A Guide for Business (Aug. 2023), https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business (last visited July 7, 2026).

relationship and data-management systems creates a substantial risk of identity theft, fraud, phishing, and social engineering. Such information can be used to open accounts, commit tax fraud, benefits fraud, and financial fraud, and the harms may recur over time.

71. The misuse of stolen information is frequently delayed. The U.S. Government Accountability Office has found that stolen data may remain dormant for a year or more before it is used, and that fraudulent use can continue for years thereafter, such that the full extent of harm from a breach often cannot be measured immediately.[36] Federal consumer-protection authorities have likewise cautioned that the absence of immediate confirmed fraud does not negate the present risk that stolen information will be misused.[37]

72. Because of the sensitivity of the information involved, Plaintiff and members of the Class face a present, imminent, and substantial risk of identity theft, fraud, phishing, and social engineering, and must devote time and resources to monitoring their financial accounts and credit to detect and mitigate misuse.

**K. Sensitive information is uniquely valuable and uniquely dangerous when stolen.**

73. Personal information is among the most valuable categories of data to criminals because it is durable and difficult to remediate. Unlike a compromised payment-card number, which can be cancelled and reissued, personal identifiers maintained in enterprise systems cannot be easily changed.

74. Unlike a compromised payment-card number, which a consumer can cancel to cut off the risk of further misuse, the types of personal information maintained in enterprise data

---

[36] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/products/gao-07-737 (last visited July 7, 2026).

[37] Ari Lazarus, Fed. Trade Comm'n, How Fast Will Identity Thieves Use Stolen Info? (May 24, 2017), https://consumer.ftc.gov/consumer-alerts/2017/05/how-fast-will-identity-thieves-use-stolen-info (last visited July 7, 2026).

systems are effectively immutable. Once stolen, such information can be exploited for years, and the harm compounds over time.

75. Stolen personal information enables identity theft, in which a criminal uses another person's identity to open accounts, obtain services, or commit fraud—creating risks to both finances and reputation that can be difficult to unwind.

76. The misuse of stolen data is frequently delayed, which makes the risk more dangerous, not less. The Government Accountability Office has found that stolen information may lie dormant for a year or more before it is used and that resulting harm can continue for years thereafter, such that the full extent of harm from a breach often cannot be measured at the outset.[38] Federal consumer-protection authorities have similarly cautioned that the absence of immediate confirmed misuse does not negate present risk.[39]

77. Because the information compromised in the Data Breach includes personal information maintained in Sharecare's enterprise systems, Plaintiff and the Class face a present and continuing risk of identity theft and fraud that will persist for years and that requires ongoing vigilance to detect and mitigate.

**L. Plaintiff and the Class must expend time and resources to mitigate the risk of harm.**

78. When sensitive information is compromised, a reasonable person must take protective steps to guard against identity theft and fraud. Federal authorities recommend that breach victims review account statements and credit reports, place fraud alerts or credit freezes, and monitor for unauthorized activity.

---

[38] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/products/gao-07-737 (last visited July 7, 2026).

[39] Ari Lazarus, Fed. Trade Comm'n, How Fast Will Identity Thieves Use Stolen Info? (May 24, 2017), https://consumer.ftc.gov/consumer-alerts/2017/05/how-fast-will-identity-thieves-use-stolen-info (last visited July 7, 2026).

79. These steps take time and, in many cases, money. The Government Accountability Office has recognized that victims of identity theft can face substantial costs and lost time to repair the damage to their credit and their records.[40]

80. Plaintiff and the Class will be required to devote time and resources to protective measures as a direct and proximate result of the Data Breach.

**M. Plaintiff and the Class lost the benefit of their bargain and the value of their information.**

81. Individuals who provide personal information to an organization reasonably expect that the organization will protect that information and use it only for the purposes they authorized. The security and privacy of that information is part of the value they receive in exchange for providing it.

82. Sharecare solicited, collected, and received personal information from Plaintiff and the Class, and in doing so, implicitly promised that the information would be kept confidential and secure. In exchange, individuals entrusted their information to Sharecare or permitted it to be shared with Sharecare by healthcare providers, health plans, employers, or other entities.

83. The Data Breach deprived Plaintiff and the Class of the benefit of this implicit bargain: their information was not protected, and its security and confidentiality have been lost.

84. Independent of any contractual entitlement, the compromised information itself has monetary value. Personal information is routinely bought and sold by data brokers and marketers, and it commands a price in both legitimate and illicit markets. When that information is compromised, its value is diminished because it is no longer secure.

**N. The private information of Plaintiff and the Class remains at risk.**

---

[40] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/products/gao-07-737 (last visited July 7, 2026).

85. Because the exfiltrated information remains in the possession of criminal actors and is subject to sale or disclosure on illicit online marketplaces, the private information of Plaintiff and the Class remains at continuing risk of misuse.

## V. PLAINTIFF-SPECIFIC ALLEGATIONS

86. In or about February 2025, Plaintiff Moran used Sharecare Health Data Services' medical-record request process to obtain records from St. John's Riverside Hospital in Yonkers, New York.

87. Plaintiff Jose H. Moran is a citizen and resident of Yonkers, Westchester County, New York.

88. Plaintiff Moran's Sharecare-related request materials identify him by name and contain his contact information and other identifying information. The request was assigned a Sharecare-related request identifier and was processed through a workflow in which Sharecare expressly advised that it would provide status notifications.

89. Plaintiff Moran's records request demonstrates that Sharecare received, processed, or maintained personal information concerning him in connection with its medical-record services.

90. Upon information and belief, based on Sharecare's documented receipt and processing of Plaintiff's identifying information through Sharecare Health Data Services and the nature and scope of the compromised Sharecare Salesforce environment, Plaintiff's personal information was among the information accessed, acquired, exfiltrated, or otherwise compromised in the Data Breach.

91. Plaintiff Moran has suffered injury as a result of the Data Breach, including the compromise and exposure of his private information, an imminent and substantial risk of identity

theft and fraud, the loss of the benefit of his bargain with Sharecare, and the diminution in value of his private information.

## VI. INJURIES COMMON TO THE CLASS

92. As a result of the Data Breach, Plaintiff and the Class have suffered common categories of injury, including: (a) the compromise and exposure of their personal information; (b) an imminent and substantial risk of identity theft, fraud, phishing, and social engineering; (c) the loss of the benefit of their bargain with Sharecare; (d) the diminution in value of their personal information; (e) the loss of privacy and loss of control over their personal information; and (f) the time and expense that will be reasonably required to monitor for and mitigate the effects of the Data Breach.

## VII. CLASS ACTION ALLEGATIONS

93. Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4) on behalf of a proposed nationwide class.

94. The proposed Class is defined as follows: All individuals residing in the United States whose personal information was accessed, acquired, exfiltrated, published, or otherwise compromised as a result of the Sharecare data breach described in this Complaint.

95. Excluded from the Class are Sharecare, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Sharecare has a controlling interest, all individuals who make a timely election to be excluded, governmental entities, and any judges assigned to hear any aspect of this litigation, as well as their immediate family members.

96. Plaintiff reserves the right to amend or modify the class definition as appropriate based on discovery and further investigation.

97. Numerosity (Rule 23(a)(1)). The Class consists of at least thousands of individuals whose information Sharecare maintained, making joinder of all members impracticable. Class members are identifiable from Sharecare's own records.

98. Commonality (Rule 23(a)(2)). Common questions of law and fact exist as to all Class members and predominate over individualized questions, including, without limitation, the following:

a. whether Sharecare collected and maintained the private information of Plaintiff and the Class;

b. whether Sharecare owed a duty to Plaintiff and the Class to implement and maintain reasonable measures to safeguard their private information;

c. whether Sharecare implemented and maintained reasonable data-security measures;

d. whether Sharecare's data-security practices met the standard of care reflected in HIPAA, in guidance from HHS and the FTC, and in recognized frameworks published by NIST and CIS;

e. whether Sharecare knew or should have known that its data-security measures were inadequate and that a breach was foreseeable;

f. whether Sharecare's conduct caused or permitted the Data Breach;

g. whether Sharecare entered into implied contracts with Plaintiff and the Class to safeguard their private information and, if so, whether Sharecare breached those contracts;

h. whether Sharecare was unjustly enriched by failing to provide the data security for which Plaintiff and the Class paid;

i. whether Plaintiff and the Class suffered injury as a result of the Data Breach and are entitled to damages;

j. whether Plaintiff and the Class are entitled to injunctive and other equitable relief, including a declaration of Sharecare's ongoing duties; and

k. the appropriate scope and terms of any injunctive relief necessary to protect the information that remains in Sharecare's possession.

99. Typicality (Rule 23(a)(3)). Plaintiff's claims are typical of the claims of the Class because Plaintiff and Class members were subjected to the same Data Breach and the same course of data-security conduct by Sharecare, and their claims arise from Sharecare's alleged failure to safeguard personal information maintained or processed in the compromised environment.

100. Adequacy (Rule 23(a)(4)). Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to those of the Class and has retained counsel experienced in complex class-action and data-breach litigation.

101. Predominance and Superiority (Rule 23(b)(3)). Common questions predominate over individualized ones, and a class action is superior to other methods for the fair and efficient adjudication of this controversy. The cost of litigating individual claims would exceed any individual recovery, and class treatment avoids the risk of inconsistent adjudications.

102. Injunctive Relief (Rule 23(b)(2)). Sharecare has acted or refused to act on grounds generally applicable to the Class, making final injunctive and corresponding declaratory relief appropriate for the Class as a whole.

103. Issue Certification (Rule 23(c)(4)). In the alternative, particular common issues—including the existence and breach of Sharecare's duty and the adequacy of its security—are appropriate for issue certification.

## VIII. CAUSES OF ACTION

**COUNT I**
**NEGLIGENCE**
***(On Behalf of Plaintiff and the Class)***

104. Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.

105. Sharecare collected, maintained, and controlled the private information of Plaintiff and the Class through its provision of digital-health and healthcare-technology services, including medical-record services.

106. By collecting and storing this sensitive information, Sharecare assumed a duty to exercise reasonable care to secure and safeguard it, to prevent its unauthorized access and disclosure, and to implement processes to detect and respond to a breach and to provide prompt and accurate notice.

107. Sharecare's duty to use reasonable care arose from its voluntary undertaking to collect and safeguard the information, from its position as the party in control of the information and best able to protect it against foreseeable criminal conduct, and from its role handling sensitive personal and health-related information.

108. The applicable standard of care is informed by well-established authorities, including the HIPAA Security Rule, which sets a recognized benchmark for safeguarding protected health information (referenced here solely as a standard-of-care benchmark and not as an independent cause of action), as well as guidance and frameworks published by the Department of Health and Human Services, the Federal Trade Commission, the National Institute of Standards

and Technology, the Cybersecurity and Infrastructure Security Agency, and the Center for Internet Security.[41]

109. Sharecare breached its duty of care by failing to implement and maintain reasonable security measures adequate to protect the private information in its custody, including, upon information and belief, by failing to adequately safeguard its systems against known threats, to monitor and detect unauthorized access, to timely remediate known vulnerabilities, and to maintain appropriate access controls and authentication.

110. It was reasonably foreseeable that Sharecare's failure to maintain reasonable security would result in the unauthorized access to and exfiltration of Plaintiff's and the Class's private information and the resulting harm, particularly given the well-documented frequency of data-theft attacks against entities in the healthcare ecosystem.[42]

111. But for Sharecare's failure to exercise reasonable care, the private information of Plaintiff and the Class would not have been accessed, acquired, and exposed. Sharecare's breach of its duty was the direct and proximate cause of the injuries suffered by Plaintiff and the Class.

112. As a direct and proximate result of Sharecare's negligence, Plaintiff and the Class have suffered and will suffer injury as described above, including the compromise of their private information, the imminent risk of identity theft and fraud, the diminution in value of their private information, and the loss of the benefit of the bargain.

[41] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, Security Rule Guidance Material, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited July 7, 2026).

[42] Identity Theft Res. Ctr., 2025 Data Breach Report (Twentieth Edition) (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf (last visited July 7, 2026).

113. Plaintiff and the Class are entitled to compensatory and consequential damages, and to injunctive and equitable relief requiring Sharecare to adopt and maintain reasonable security measures and to provide adequate credit and identity monitoring.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
***(On Behalf of Plaintiff and the Class)***

114. Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.

115. Plaintiff and members of the Class who directly provided information to or transacted with Sharecare or Sharecare Health Data Services provided their private information in the course of that relationship. In exchange, Sharecare received the information and, in applicable cases, payment for its services.

116. Implicit in the parties' relationship was Sharecare's agreement to safeguard the private information it collected or received, to use that information only for authorized purposes, and to provide timely and accurate notice in the event of a breach.

117. The mutual understanding and intent that Sharecare would protect this information is demonstrated by the parties' conduct, by the sensitive and confidential nature of the information exchanged, and by Sharecare's obligations as an entity handling sensitive personal and health-related information.

118. Plaintiff and the Class would not have entrusted their private information to Sharecare, or permitted their information to be processed by Sharecare, absent Sharecare's implied agreement to safeguard it.

119. Plaintiff and the Class performed their obligations under the implied contract by providing their information and, in applicable cases, paying for Sharecare's services.

120. Sharecare breached the implied contract by failing to implement reasonable data-security measures and by failing to safeguard the private information.

121. As a direct and proximate result of Sharecare's breach, Plaintiff and the Class did not receive the full benefit of their bargain and instead received services of diminished value, and they suffered the injuries described above.

122. Plaintiff and the Class are entitled to compensatory, consequential, and nominal damages, and to appropriate injunctive and equitable relief.

**COUNT III**
**UNJUST ENRICHMENT**
***(On Behalf of Plaintiff and the Class)***

123. Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein. Plaintiff brings this Count in the alternative to the breach-of-implied-contract claim.

124. Plaintiff and members of the Class who directly provided information to or transacted with Sharecare or Sharecare Health Data Services conferred a benefit on Sharecare by entrusting Sharecare with their valuable private information and, in applicable cases, by providing payment for services.

125. Sharecare appreciated and retained that benefit. A portion of the value Sharecare received was reasonably understood to be dedicated to providing adequate data security for the information entrusted to it.

126. Sharecare failed to provide the reasonable data security for which Plaintiff and the Class bargained, and instead retained the benefit of the reduced costs realized by not implementing adequate safeguards.

127. Under these circumstances, it would be inequitable and unjust for Sharecare to retain the benefit it received without providing the data security that formed part of the consideration for the parties' exchange.

128. Plaintiff and the Class are entitled to restitution, disgorgement, or the imposition of a constructive trust in the amount by which Sharecare was unjustly enriched.

**COUNT IV**
**DECLARATORY JUDGMENT**
***(On Behalf of Plaintiff and the Class)***

129. Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.

130. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, this Court may declare the rights and legal relations of the parties and grant further necessary or proper relief.

131. An actual controversy exists between Plaintiff and the Class, on the one hand, and Sharecare, on the other, concerning whether Sharecare owes ongoing duties to safeguard the private information that remains in its possession, whether Sharecare's existing data-security measures are reasonable and adequate, and whether Plaintiff and the Class remain at risk of further harm.

132. Sharecare continues to maintain the private information of Plaintiff and the Class, and, upon information and belief, continues to employ data-security measures that are inadequate to protect that information against foreseeable threats.

133. Plaintiff therefore seeks a declaration that (a) Sharecare owes a duty to Plaintiff and the Class to implement and maintain reasonable data-security measures; (b) Sharecare's existing measures are inadequate; and (c) reasonable data-security measures, as specified in the Prayer for Relief, must be implemented and maintained.

134. A declaratory judgment is necessary and appropriate so that Plaintiff and the Class may ascertain their rights and so that Sharecare's continuing duties may be established and enforced.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment against Sharecare and grant the following relief:

A. An order certifying the proposed Class, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. A declaration that Sharecare owes ongoing duties to safeguard the private information of Plaintiff and the Class and that its existing data-security measures are inadequate;

C. Injunctive and equitable relief requiring Sharecare to implement and maintain reasonable data-security measures, including, without limitation:

i. engaging independent third-party security auditors and internal personnel to conduct testing, including simulated attacks and penetration tests, on Sharecare's systems on a periodic basis;

ii. auditing, testing, and training Sharecare's security personnel regarding any new or modified procedures;

iii. encrypting private information maintained by Sharecare and implementing appropriate access controls, including multifactor authentication;

iv. segmenting data and implementing appropriate network monitoring, logging, and intrusion detection;

v. implementing a comprehensive information-security program with regular vulnerability scanning, timely patching, and threat management;

vi. conducting regular database scanning and security checks;

vii. routinely conducting internal training and education for employees on how to identify, contain, and respond to data-security threats;

viii. purging, deleting, and destroying private information no longer necessary for Sharecare's provision of services, in a reasonable manner;

ix. meaningfully educating Class members about the threats they face as a result of the Data Breach and the measures they can take to protect themselves;

x. implementing logging and monitoring sufficient to detect and track anomalous access to systems containing private information;

xi. engaging an independent third party to conduct periodic assessments of Sharecare's information-security program and to report the results to the Court and to Class Counsel for an appropriate period; and

xii. providing Class members with adequate credit monitoring and identity-theft protection, and the means to obtain reimbursement for losses fairly traceable to the Data Breach;

D. An award of damages, including actual, compensatory, consequential, and nominal damages, in an amount to be determined at trial;

E. An award of restitution and disgorgement as pleaded in the alternative;

F. An award of credit monitoring and identity-theft protection, and the costs of such monitoring, for an appropriate period;

G. An award of pre- and post-judgment interest as allowed by law;

H. An award of reasonable attorneys' fees, costs, and litigation expenses as allowed by law; and

I. Such other and further relief as the Court deems just and proper.

## X. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

Dated: August 27, 2026

Respectfully submitted,

*/s/ Scott C. Harris*
Scott C. Harris (GA Bar No.: 101830)
**BRYSON HARRIS SUCIU & DEMAY, PLLC**
900 W. Morgan St. Raleigh, NC 27603
Tel: 919-600-5003
Fax: 919-600-5035
sharris@brysonpllc.com

Scott J. Falgoust*
**BRYSON HARRIS SUCIU & DEMAY PLLC**
5301 Canal Boulevard
New Orleans, LA 70124

(919) 585-5634
sfalgoust@brysonpllc.com

**Application for admission pro hac vice forthcoming.*

*Counsel for Plaintiff and the Class*